**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 98-4150

KERRY L. ELLIS, SR.; SEAWITCH
SALVAGE, INCORPORATED,
Defendants-Appellants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CR-96-361-WMN)

Argued: December 3, 1998

Decided: February 22, 1999

Before LUTTIG, WILLIAMS, and TRAXLER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Larry Allen Nathans, BENNETT & NATHANS, L.L.P.,
Baltimore, Maryland, for Appellants. William Warren Hamel, Assis-
tant United States Attorney, Baltimore, Maryland, for Appellee. **ON
BRIEF:** Jason D. Tulley, BENNETT & NATHANS, L.L.P., Balti-
more, Maryland; Paul R. Kramer, PAUL R. KRAMER, P.A., Balti-
more, Maryland, for Appellants. Lynne A. Battaglia, United States
Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

After an eleven-day jury trial, Kerry Ellis and Seawitch Salvage (collectively Ellis) were found guilty of violating the Clean Air and Clean Water Acts by improperly removing and disposing of asbestos during the breaking of Navy surplus vessels, failing to notify the appropriate environmental agency that asbestos removal was occurring at the site, and dumping debris and petroleum products into the Baltimore Harbor without a permit. Additionally, Ellis was convicted of making a false statement to the Department of Defense regarding the extent of asbestos removal from a ship.

On appeal, Ellis challenges these convictions arguing: the indictment was constructively amended when the judge instructed the jury on too broad a definition of friable asbestos; defense counsel was ineffective; prosecutorial misconduct occurred during closing argument; the jury instructions on counts five and six (Clean Water Act violations) erroneously omitted the knowledge requirement; and the Government produced insufficient evidence to support the false statement conviction. Finding no reversible error, we affirm.

I.

Kerry Ellis was owner and president of Seawitch Salvage, a ship-breaking business located on the Baltimore Harbor along the Patapsco River. As part of his business operations, Ellis purchased decommissioned Navy vessels and demolished them into scrap metal. The scrap was then sold to interested parties.

Through the government contracting process established by the Defense Reutilization and Marketing Service (DRMS), Ellis successfully bid on and purchased two decommissioned Navy minesweepers, the USS Inflict and the USS Fearless. Seawitch also entered into sub-

2

contracts for the breaking of a third minesweeper, the USS Illusive, as well as a midway class aircraft carrier, the USS Coral Sea. The invitations for bids provided by the DRMS clearly indicated that several compartments on each of the four decommissioned ships contained asbestos. Before the ships were sold, the Navy marked each asbestos-containing compartment with a large warning sign. Purchasers of the ships agreed, through language in the contract documents, to dispose of all asbestos in accordance with applicable regulations.

When Ellis purchased the first two minesweepers, Inflict and Fearless, he certified, in accordance with 40 C.F.R. § 61.145(b)(3),[1] that asbestos abatement would be performed by Asbestos Environmental Services of Maryland (AES) prior to demolition. AES completed abatement work on Inflict and Fearless, removing approximately 1200 linear meters of pipe insulation and 800 square meters of stack insulation from the ships.

The Illusive arrived from the primary contractor, Camden Iron and Metal, in May of 1993. Camden Iron and Metal informed the DRMS that Ellis would be responsible for asbestos abatement, but Ellis did not file the required NESHAP notice and no asbestos abatement occurred prior to the breaking of the Illusive .

In August 1994, EPA agents visited Ellis to investigate whether the asbestos from the Inflict, Fearless, and Illusive had been properly abated. During that inspection, agents found what appeared to be asbestos-containing materials in large piles, exposed to the elements. Subsequently, in October 1994, EPA and FBI agents executed a

_____

[1] Asbestos handling is regulated under the National Emission Standards for Hazardous Air Pollutants (NESHAP) contained in 40 C.F.R. part 61, subpart M. The Standard for demolition and renovation, 40 C.F.R. § 61.145(b) includes several notification provisions. The owner or operator of a demolition or renovation facility containing "[a]t least 80 linear meters (260 linear feet) of regulated asbestos containing material on pipes or at least 15 square meters (160 square feet) on other facility components," 40 C.F.R. § 61.145(a)(1)(i), must deliver written notice to the Administrator at least ten working days before undertaking any work that "would break up, dislodge, or similarly disturb asbestos material," 40 C.F.R. § 61.145(b)(3)(i) (1998).

3

search warrant at the Seawitch site. During the search of the property, agents took twelve samples of debris at the site to the lab for chemical analysis. Nine samples taken pursuant to the search warrant were found to contain concentrations of asbestos in excess of 1%.

Also on the site at the time of the search was the Coral Sea, which had arrived at Seawitch from the prime contractor on July 6, 1993. Prior to the breaking of the Coral Sea, Ellis contacted AES to perform some asbestos abatement work on the ship. In February 1994, after filing the appropriate NESHAP notice, AES removed approximately fifty-two feet of asbestos from two areas of the ship, frames 121 and 60. In his report to DRMS regarding the progress of asbestos abatement on the Coral Sea, however, Ellis stated that AES had abated asbestos from frames 121, 175, 60, and 179.

During demolition of the Coral Sea, on December 5, 1994, an on-site environmental compliance specialist, Douglas Hensel, from the consulting firm of Environmental Profiles, who had been retained by the prime contractor, witnessed water running off of the deck of the ship and creating an oily sheen on the water. Hensel went on board and viewed the workers hosing off the top deck in order to clean off debris. He informed Ellis that this act was "probably a violation of something." (J.A. at 357.) Ellis replied that he had a permit for dumping water from the ships. Later, Hensel observed a sheen moving out toward the bay and he also observed Seawitch personnel drizzling dish liquid onto the sheen in order to cause the sheen to sink. Hensel recorded his observations in writing.

Another search warrant was executed at the Seawitch site on September 27, 1995. This search focused on the Coral Sea, and thirty-three samples of potentially asbestos-containing material were taken from the ship. Eleven of those samples tested positive for greater than 1% asbestos.

As a result of the investigation of Ellis's ship-breaking practices, Ellis was charged in a seven count indictment. Specifically, in count one the Government charged Ellis with violations of 42 U.S.C.A. § 7413(c)(2) (West 1995)[2] and 18 U.S.C.A. § 2 (West 1969)[3] for fail-

_____

[2] § 7413. Federal enforcement

. . .

4

ure to file a written notice as required under the Clean Air Act of his intention to demolish, strip, and remove friable asbestos from a mine-sweeper formerly known as the <u>Illusive</u>. In count two, Ellis was charged with violations of 42 U.S.C.A. § 7413(c)(1)**4** and 18 U.S.C.A.

_____

(c) Criminal penalties

. . .

(2) Any person who knowingly--

(A) makes any false material statement, representation, or cer-tification in, or omits material information from, or knowingly alters, conceals, or fails to file or maintain any notice, applica-tion, record, report, plan, or other document required pursuant to this chapter to be either filed or maintained (whether with respect to the requirements imposed by the Administrator or by a State);

(B) fails to notify or report as required under this chapter; or

(C) falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be main-tained or followed under this chapter

shall, upon conviction, be punished by a fine pursuant to Title 18, or by imprisonment for not more than 2 years, or both. If a conviction of any person under this paragraph is for a violation committed after a first con-viction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment.

**3** § 2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is pun-ishable as a principal.

(b) Whoever willfully causes an act to be done which if directly per-formed by him or another would be an offense against the United States, is punishable as a principal.

**4** § 7413. Federal enforcement

. . .

(c) Criminal penalties

(1) Any person who knowingly violates any requirement or prohibition of an applicable implementation plan (during any period of federally

§ 2 for improper removal and disposal of friable asbestos from the <u>Illusive</u>. In count three, the Government charged that Ellis violated 42 U.S.C.A. § 7413(c)(1) and 18 U.S.C.A. § 2 when he improperly removed friable asbestos from the <u>Coral Sea</u>. In count four, the Government charged Ellis with making a false statement to DRMS regarding asbestos removal on the <u>Coral Sea</u> in violation of 18 U.S.C.A. § 1001 (West Supp. 1998)**5**  and 18 U.S.C.A. § 2. In count

---

assumed enforcement or more than 30 days after having been notified under subsection (a)(1) of this section by the Administrator that such person is violating such requirement or prohibition), any order under subsection (a) of this section, requirement or prohibition of section 7411(e) of this title (relating to new source performance standards), section 7412 of this title, section 7414 of this title (relating to inspections, etc.), section 7429 of this title (relating to solid waste combustion), section 7475(a) of this title (relating to preconstruction requirements), an order under section 7477 of this title (relating to preconstruction requirements), an order under section 7603 of this title (relating to emergency orders), section 7661a(a) or 7661b(c) of this title (relating to permits), or any requirement or prohibition of subchapter IV-A of this chapter (relating to acid deposition control), or subchapter VI of this chapter (relating to stratospheric ozone control), including a requirement of any rule, order, waiver, or permit promulgated or approved under such sections or subchapters, and including any requirement for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter) shall, upon conviction, be punished by a fine pursuant to Title 18, or by imprisonment for not to exceed 5 years, or both. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment.
**5** § 1001. Statements or entries generally

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

> (2) makes any materially false, fictitious, or fraudulent statement or representation; or

> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

6

five, Ellis was charged with releasing a quantity of oil into the Patapsco River in violation of 33 U.S.C.A. § 1321(b)(3) (West Supp. 1998),**6**

_____

shall be fined under this title or imprisoned not more than 5 years, or both.

(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to--

> (1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

> (2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

**6** § 1321. Oil and hazardous substance liability

. . .

(b) Congressional declaration of policy against discharges of oil or hazardous substances; designation of hazardous substances; study of higher standard of care incentives and report to Congress; liability; penalties; civil actions: penalty limitations, separate offenses, jurisdiction, mitigation of damages and costs, recovery of removal costs; alternative remedies and withholding clearance of vessels.

> . . .

> (3) The discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.] or the Deep Water Port Act of 1974 [33 U.S.C.A. § 1501 et seq.], or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including

33 U.S.C.A. § 1319(c)(2)(A) (West Supp. 1988), **7** and 18 U.S.C.A. § 2. Count Six charged that Ellis had discharged pollutants -- dirt and construction debris (paint chips, metal fragments, insulation materials) -- into the Patapsco River in violation of 33 U.S.C.A. § 1311(a),**8** 1319(c)(2)(A) (West 1986) and 18 U.S.C.A. § 2(a). Finally, in count seven, the Government charged that Ellis disposed of refuse matter (dirt, tires, bricks, construction debris, paint chips, metal fragments, wood, and insulation material) from a ship into the Patapsco River

_____

resources under the Magnuson-Stevens Fishery Conservation and Management Act [16 U.S.C.A. § 1801 et seq.]), in such quantities as may be harmful as determined by the President under paragraph (4) of this subsection, is prohibited, except (A) in the case of such discharges into the waters of the contiguous zone or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act), where permitted under the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, 1973, and (B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful. Any regulations issued under this subsection shall be consistent with maritime safety and with marine and navigation laws and regulations and applicable water quality standards.

**7** § 1319(c)(2)(A)

Any person who . . . knowingly violates section 1311, 1312, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State, or any requirement imposed in pretreatment program approved under section 1342(a)(3) or 1342(b)(8) of this title or in a permit issued under section 1344 of this title by the Secretary of the Army or by a State . . . .

**8** § 1311. Effluent limitations

(a) Illegality of pollutant discharges except in compliance with law

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

without a permit, in violation of 33 U.S.C.A. §§ 407, 411 (West 1986 & Supp. 1998).**9**

_____

**9** § 407. Deposit of refuse in navigable waters generally

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: Provided, That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: And provided further, That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful.

§ 411. Penalty for wrongful deposit of refuse; use of or injury to harbor improvements, and obstruction of navigable waters generally

Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, 409, 414, and 415 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of up to $25,000 per day, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction.

On May 12, 1997, Ellis proceeded to trial before a jury on the seven counts contained in the indictment. The jury returned a verdict of guilty on all counts on May 30, 1997. Sentencing occurred on February 13, 1998. The district court sentenced Kerry Ellis to thirty months imprisonment and three years supervised release. Additionally, the district court assessed a $50,000.00 fine. Further, the district court sentenced Seawitch Salvage to five years probation and ordered the company to pay a $50,000 fine. Ellis filed a timely notice of appeal.[10]

## II.

Ellis challenges his convictions, asserting that five significant trial errors took place that require reversal. First, Ellis claims that a constructive amendment to counts one, two, and three of the indictment occurred, when, pursuant to defense counsel's request, the district court instructed the jury under the broader definition of "regulated asbestos containing material" rather than "friable asbestos" as charged in the indictment. In the alternative, Ellis argues that defense counsel provided constitutionally deficient representation by proffering the overbroad definition of asbestos. Additionally, Ellis asserts that the Government's closing arguments did not conform to the evidence in twelve respects, and therefore, his convictions should be reversed for prosecutorial misconduct. Ellis also challenges the district court's jury instructions on counts five and six, stating that the instructions were deficient under United States v. Wilson, 133 F.3d 251 (4th Cir. 1997). Finally, Ellis argues that the Government produced insufficient evidence to support a conviction under count four of the indictment, the false statement charge.

We address each of these challenges to Ellis's convictions in turn.

## A.

Ellis first contends that the district court gave jury instructions that constructively amended counts one, two, and three of the indictment, impermissibly broadening the basis of Ellis's conviction in violation of the Grand Jury Clause of the Fifth Amendment. See United States v. Floresca, 38 F.3d 706, 710 (4th Cir. 1994) (en banc).

_____

[10] Ellis does not appeal his sentence or fine.

In count one of the indictment, Ellis was charged with failing to file the required notice of his "intention to demolish, to strip, and remove friable asbestos from a minesweeper, formerly known as the U.S.S. Illusive." (J.A. at 19 (emphasis added).) In count two, Ellis was charged with mishandling "friable asbestos" during its removal from the Illusive, and thereby failing to conform to workplace standards for asbestos removal. Similarly, in count three, the Government charged that Ellis had mishandled "friable asbestos" during demolition of the Coral Sea.

During trial, defense counsel requested that the district court instruct the jury in a manner that conformed closely to the regulations. Those regulations speak in terms of "Regulated Asbestos Containing Material" (RACM) rather than "friable asbestos." Thus, regarding count one, for example, the jury was instructed as follows:

> In order to prove the defendant guilty of count one of the indictment, the government must prove on or about the dates set forth in the indictment each of the following elements:
>
> . . .
>
> [F]irst that the defendants were owners or operators of a facility. Secondly, that they knowingly failed to file or caused the failure to file required written notice of intent to demolish or remove regulated asbestos.
>
> Second element requires proof that the required notice of intent to demolish or remove regulated asbestos containing material was not filed.

(J.A. at 705-07.)

> The term regulated asbestos containing material includes friable asbestos material, category one, non-friable asbestos containing materials that ha[ve] become friable. Category one. Non-friable asbestos containing material that will be or has been subject to sanding or grinding or cutting or abrading. Or, category two, non-friable asbestos containing mate-

11

rial that has a high probability of becoming or has become crumbled or pulverized or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations.[11]

(J.A. at 708.)

As used in the indictment and these instructions, the term friable asbestos material means any material containing more than one percent asbestos by weight that hand pressure can crumble, crush or reduce to powder when dry. [12]

(J.A. at 708-09.)

As a result of these instructions, Ellis argues that the district court impermissibly broadened the basis for his conviction. Ellis claims that, because it was given the definition of "regulated asbestos-containing material" during the charge, the jury could have based his conviction upon a finding that nonfriable asbestos was present on the Illusive and Coral Sea during demolition instead of "friable asbestos" as stated in the indictment. (J.A. at 708.)

As we mentioned earlier, and Ellis concedes, however, the defense requested these instructions. Even if the instructions were erroneous,[13]

_____

[11] This definition is substantively identical to the definition of "Regulated asbestos-containing material (RACM)" found at 40 C.F.R. § 61.141.

[12] This definition conforms to the definition of "friable asbestos material" contained in 40 C.F.R. § 61.141.

[13] Because we conclude that the invited error doctrine applies to the jury instructions, we need not address the merits of Ellis's contention that the jury instructions created a constructive amendment to the indictment.

Based on the evidence and argument adduced at trial, however, we would conclude that the difference between the language of the indictment and the language of the jury instructions was a variance, not a constructive amendment. A constructive amendment occurs when the possible bases for conviction are broadened beyond the bases appearing in the indictment, and as a result, the defendant is convicted of a crime

12

the error in the instructions was invited by the defense and cannot now form the basis for relief. See Wilson v. Lindler, 8 F.3d 173, 175 (4th Cir. 1993) (en banc). "The invited error doctrine recognizes that a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such a request." United States v. Jackson, 124 F.3d 607, 617 (4th Cir. 1997) (internal quotation marks omitted). Ellis acknowledges that the jury instructions must be reviewed for invited error and urges us to consider adopting an exception to the invited error doctrine. We decline to do so. This Court has repeatedly stated that "[w]e have never held in this court that an appeal may lie from an invited error." AG Systems, Inc. v. United Decorative Plastics Corp., 55 F.3d 970, 972 (4th Cir. 1995) (citing United States v. Herrera, 23 F.3d 74, 75 (4th Cir. 1994); Wilson, 8 F.3d 173; American Ins. Co. v. Vann, 118 F.2d 1004, 1005 (4th Cir. 1941) (per curiam); 9A Wright & Miller, Federal Practice and Procedure § 2558, at 470-71 (1995)). Heretofore, we have applied the invited error rule without exception, and we are now foreclosed from changing course. See Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a

_____

not addressed by the grand jury. See United States v. Miller, 471 U.S. 130, 138-39 (1985); Stirone v. United States, 361 U.S. 212 (1960). When the elements of the crime for which a defendant is convicted are set out in the indictment, the evidence presented during trial establishes only facts that were alleged in the indictment, and jury instructions do not modify the essential elements of the offense charged, there can be no constructive amendment. See United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991).

The use of the term "regulated asbestos-containing material" during jury instructions on counts one, two, and three instead of "friable asbestos" was, at most, a variance from the indictment. "Regulated asbestos-containing material" simply encompasses asbestos that is either always friable or becomes friable over the course of the demolition process. Because "regulated asbestos-containing material" as defined by the district court during jury instructions did not encompass non-friable asbestos, the basis for Ellis's conviction was not expanded beyond that which was contemplated by the grand jury.

13

superseding contrary decision of the Supreme Court." (internal quotation marks omitted)).

B.

Next, Ellis argues that "[i]f this [c]ourt does not excuse trial counsel's invited error, such error constitutes ineffective assistance of counsel." (Appellant's Br. at 31.) As a general rule, "a claim of ineffective assistance of counsel should be raised in a 28 U.S.C. § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance." United States v. Williams, 977 F.2d 866, 871 (4th Cir. 1992). Ellis argues that ineffective assistance is clearly established on the face of the record because trial counsel actively sought the use of the phrase"regulated asbestos-containing material," with its definition, throughout the closing segments of the trial. As a result, Ellis argues that trial counsel participated in the constructive amendment of his indictment and was obviously ineffective.

We disagree. The record does not conclusively demonstrate that trial counsel's representation at the end of trial was below the threshold of reasonableness. Ellis's trial attorney pursued a three-pronged strategy. First, trial counsel attempted to call into question the nature of the materials present on board the Coral Sea and the Illusive. Counsel urged the jury to find Ellis not guilty if the government had not proved beyond a reasonable doubt that asbestos, as opposed to another insulating material, was present on the ships. Second, Ellis's attorney argued that mere presence of asbestos was not sufficient to provide the basis of a conviction. Rather, he contended that the Government had to prove beyond a reasonable doubt that the asbestos on board the Illusive and Coral Sea was friable at the inception of the demolition or became friable over the course of the demolition. Third, trial counsel argued that if the jury found beyond a reasonable doubt that regulated materials were on board the ship at the time of demolition, then the jury must address Ellis's mental state and determine whether he knew those materials were on board and nonetheless disregarded the demolition regulations. In light of the evidence presented by the Government, indicating that Ellis had ample notice that asbestos was aboard the ships and had previously taken proper precautions under similar circumstances when demolishing the Inflict and the

14

Fearless, defense counsel's decision to ensure that the jury understood and put the Government to its burden of proof on the threshold requirements of the regulations was not patently unreasonable.

Although we note that "[s]trategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable," Strickland v. Washington, 466 U.S. 668, 690 (1984); accord Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995), the record does not conclusively establish ineffective assistance, therefore the claim is not cognizable on direct review. See Williams, 977 F.2d at 871.

C.

Ellis also asserts that the Government committed reversible prosecutorial misconduct during its closing argument when it made twelve distinct incorrect or misleading statements of fact or law relating to the friability of asbestos aboard the Illusive and the Coral Sea. Specifically, Ellis avers that the following comments were misleading because they misstated the testimony at trial:

> 1. "Basically count one or the elements of count one w[ere] that the defendant was owner and operator of a facility and he knowingly failed to file a written notice of intent to demolish or remove asbestos containing materials."

(J.A. at 605.)

> 2. "Number one, you have to notify E.P.A. or M.D.E. that you are going to do it, that there is some asbestos or probably some asbestos there and you are going to do the demolition."

(J.A. at 606.)

> 3. "[Y]ou got to get the asbestos material out of the ship before you start demolition, before you start any of the breaking, the cutting up and dropping and smashing, you got to get it out."

15

(J.A. at 607.)

4. "And Peggy Forney, the analyst for the E.P.A., who analyzed the samples taken by Doug Parker also testified those samples were friable as well. Again a regulated asbestos containing material."

(J.A. at 611.)

5. "He [Harold Mack] got on the stand and testified that certainly there was asbestos containing material, friable asbestos containing material on the Illusive at the time of decommissioning. It was the last time he saw it."

(J.A. at 612.)

6. "Harold Mack, the man again who as I said is more familiar with these ships than anyone you could possibly name said that there was 1500 linear feet covered with regulated asbestos containing material at the time of decommissioning."

(J.A. at 615-16.)

7. "Peggy Forney testified about the friability of the other samples that were taken by Doug Parker."

(J.A. at 617.)

8. "But he [Harold Mack] did estimate that there were thousands of linear feet of RACM on the Coral Sea at the time of decommissioning."

(J.A. at 625.)

9. "You also heard from Mr. Bielecki, an asbestos contractor working for Falcon Associates who walked onto the Coral Sea in Philadephia. He said areas were undisturbed. There was no doubt in his mind that there were 260 linear feet of RACM on that ship."

16

(J.A. at 626.)

> 10. "Then there were samples that were taken during the various -- samples taken during the September 1995 search warrant. You saw testimony or you heard testimony and saw the samples testified to about the various locations, a floor tile, and then materials that were friable from sample 20, 21, 22, 28, 24, and 25."

(J.A. at 627.)

> 11. "Peggy Forney told you that she had actually touched them, crumbled them, and they were friable."

(J.A. at 627.)

> 12. "And you heard Charlie Sledge testify that of course there would be condensate, that RACM ordinarily would not be removed even if you were replacing a radiator because Navy policy [sic]."

(J.A. at 629.)

In reviewing this claim, we must determine whether the prosecutor's statements of the evidence "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). Because Ellis did not object to the Government's closing argument, we review for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano , 507 U.S. 725, 734 (1993); United States v. DePew, 932 F.2d 324, 327-28 (4th Cir.1991). We may correct plain error when we find (1) an error, (2) which is plain and obvious under existing law, and (3) which"affect[s] substantial rights." Olano, 507 U.S. at 732."If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." Johnson v. United States, 117 S. Ct. 1544, 1549 (1997) (alteration in original) (internal quotation marks omitted).

17

To prevail on a claim of prosecutorial misconduct, a defendant must show that the remarks were improper and that they prejudicially affected his substantial rights so as to deprive him of a fair trial. See United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993). Moreover, rather than looking at isolated statements, we must review the entire proceeding to determine whether the alleged misconduct undermined the trial's fundamental fairness. See United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995). In deciding whether there was prejudice, this court considers (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused, (2) whether the remarks were isolated or extensive, (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused, and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. See United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983).

Assuming, without deciding, that the statements Ellis challenges were inaccurate, his claim must fail because he cannot show the requisite prejudice required under the third prong of the plain error standard. If the Government erroneously cited the evidence presented during trial in its closing arguments, those inaccuracies were cured by the following instruction from the court:

> In determining the facts, you must rely on your recollection of the evidence. What the lawyers have said in the opening statements, in their closing arguments, in objections, or in their questions is not evidence.

(J.A. at 751.) We conclude that this instruction, which the jury is presumed to have followed, mitigated any prejudicial effect the Government's alleged misstatements of the evidence had upon Ellis. Cf. United States v. Loayza, 107 F.3d 257, 262 (4th Cir. 1997) (concluding that the district court's curative instruction prevented a prejudicial statement by the prosecutor from misleading the jury); United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994) (noting the power of a curative instruction, and stating "we follow the presumption that the jury obeyed the district court's limiting instructions"). Because Ellis cannot demonstrate the requisite prejudice, we reject his claim of prosecutorial misconduct.

18

D.

Ellis further contends that the district court gave erroneous jury instructions regarding counts five and six of his indictment, Clean Water Act violations. Ellis's argument hinges on our recent decision in United States v. Wilson, in which we held that "the Clean Water Act, 33 U.S.C. § 1319(c)(2)(A) requires the government to prove the defendant's knowledge of facts meeting each essential element of the substantive offense, but need not prove that he knew his conduct to be illegal." 133 F.3d 251, 262 (4th Cir. 1997) (citations omitted). Ellis claims that the instructions the jury received during his trial run afoul of our intervening decision in Wilson because they did not adequately explicate the mens rea requirement. Because Wilson was not the law of the circuit at the time of his conviction,[14] Ellis did not object to the instructions at trial.

Because Ellis did not object to the instructions during trial, we must review for plain error. See Johnson v. United States, 117 S. Ct. 1544, 1547 (1997). The Supreme Court has made clear that plain error review is appropriate even when, as here, the asserted error is the result of an intervening change in the law and therefore was not error at the time of trial. See id. at 1548-49. As we mentioned earlier, we may correct plain error when we find (1) an error, (2) which is plain and obvious under existing law, and (3) which "affect[s] substantial rights." United States v. Olano, 507 U.S. 725, 732 (1993). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." Johnson, 117 S. Ct. at 1549 (alteration in original) (internal quotation marks omitted).

We turn now to applying this test.

_____

**14** Ellis was convicted on May 30, 1997. Wilson was handed down on December 23, 1997. Wilson's holding applies to counts five and six of the indictment because that decision interpreted 33 U.S.C.A. § 1319(c)(2)(A), which operates as the gateway to criminal liability under the Clean Water Act.

1.

The first question presented under plain error review is whether error occurred. In order to evaluate whether error occurred in this instance, a straightforward comparison between the jury instructions given during Ellis's trial, and those mandated by Wilson is in order.

In Wilson, we held:

> In light of our conclusion that the government need only prove the defendant's knowledge of the facts meeting each essential element of the substantive offense and not the fact that defendant knew his conduct to be illegal, in order to establish a felony violation of the Clean Water Act, we hold that it must prove: (1) that the defendant knew that he was discharging a substance, eliminating a prosecution for accidental discharges; (2) that the defendant correctly identified the substance he was discharging, not mistaking it for a different, unprohibited substance; (3) that the defendant knew the method or instrumentality used to discharge the pollutants; (4) that the defendant knew the physical characteristics of the property into which the pollutant was discharged that identify it as a wetland, such as the presence of water and water-loving vegetation; (5) that the defendant was aware of the facts establishing the required link between the wetland and waters of the United States; and (6) that the defendant knew he did not have a permit.

Wilson, 133 F.3d at 264 (footnote omitted).

During Ellis's trial, the jury was given the following instruction regarding count five of the indictment:

> In order to prove the defendant guilty of count five of the indictment, the government must prove beyond a reasonable doubt each of the following elements:
>
> One, that on or about the dates set forth in the indictment, the defendants knowingly discharged oil into the waters of the United States in a harmful quantity.

20

(J.A. at 722.) The district court also defined for the jury the terms "oil," "discharge," "waters of the United States," and "harmful quantity."

Similarly, the district court gave this instruction regarding count six:

> In order to prove the defendant guilty of count six of the indictment, the government must prove beyond a reasonable doubt each of the following elements:
>
> One, that on or about the date set forth in the indictment, the defendants knowingly discharged or caused to be discharged a pollutant from a point source into waters of the United States and without a permit.

(J.A. at 724.) To clarify the instruction, the district court provided definitions of "discharge of a pollutant,""pollutant," "point source," and "person." Additionally, the district court gave the jury three instructions regarding knowledge:

> The term knowingly means that an act was done voluntarily and intentionally and not because of mistake, accident, negligence, or some other innocent reason.
>
> . . . .
>
> For the purpose of the Clean Water Act, counts five and six, the government must prove that the defendants knew the general nature of the materials that were being discharged and the nature of their acts. The government does not have to show that the defendants knew the legal status of the materials being discharged or that they were violating the law.
>
> In determining whether the defendant acted knowingly, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him. If you find beyond a reasonable doubt that the defendant

21

> acted with a conscious purpose to avoid learning the truth, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken.

(J.A. at 726.) Overall, these instructions are quite similar to those that were given by the district court in Wilson, 133 F.3d at 260. Thus, applying the holding in Wilson to the facts of this case we conclude that error occurred during Ellis's trial. The jury should have been given more specific instructions indicating that knowledge was the appropriate mens rea requirement for all elements of the crime. Therefore, Ellis's claim satisfies Olano's first prong.

2.

Next, we must assess whether the error was "plain." Olano, 507 U.S. at 34. This task has been simplified in light of the Supreme Court's recent decision in Johnson. In Johnson, the court made clear that the appropriate reference point for determining whether error is "plain" is the time of the appeal, rather than the time of trial. 117 S. Ct. at 1549. Therefore, because Wilson is now the law of the circuit, the error is plain and the second prong of Olano is fulfilled.

3.

Our third inquiry is whether the error in Ellis's jury instructions "affect[ed] [his] substantial rights." Olano, 507 U.S. at 732. Although the burden lies with the appellant to establish that the error affected his substantial rights on plain error review, id. at 734, under the law of this circuit, a "`failure to instruct on an element of the crime, where the jury never made the constitutionally required findings' automatically satisfies the third prong of the plain-error analysis without a specific showing of prejudice by the [appellant]." United States v. Hastings, 134 F.3d 235, 240 (4th Cir. 1997) (quoting United States v. David, 83 F.3d 638, 647 (4th Cir. 1996)). In contrast, it is also firmly established that in instances when the jury is merely misinstructed, asked to make the correct findings under an incorrect standard, the appellant retains the burden to prove that the erroneous instruction affected his substantial rights. See id.

22

Here, we conclude that the district court's error was one of noninstruction. The instructions were inadequate under Wilson because they "did not adequately impose on the government the burden of proving knowledge with regard to each statutory element." 133 F.3d at 265. The erroneous jury instructions given during Ellis's trial prevented the jury from making a factual finding on the mens rea required for each element of the crime. As a result, prejudice to Ellis is presumed under Olano's third prong. See Hastings, 134 F.3d at 240-41.

4.

Because we conclude that the error in Ellis's jury instructions on counts five and six satisfies the first three parts of the Olano test, the error was plain and we must now turn our attention to the fourth query -- "whether the forfeited error seriously affects the fairness, integrity or public reputation of judicial proceedings." Johnson, 117 S. Ct. 1550 (internal quotation marks omitted). If the error does not meet this fourth requirement, we should not exercise our discretion to correct it. See Olano, 507 U.S. at 736. In making this determination, we evaluate whether a miscarriage of justice has occurred as a result of trial error. See United States v. Jarvis, 7 F.3d 404, 413 (4th Cir. 1993). In this instance, the erroneous jury instructions do not surmount this high hurdle. The evidence of Ellis's knowledge was simply overwhelming. As a result, the failure to instruct the jury on the knowledge requirement is not error that affects the integrity, fairness, or public reputation of the judicial process, and we will not exercise our discretion to correct it.

No miscarriage of justice has occurred in this case because there simply cannot be any question that Ellis understood the nature of his property. The nature of the property was not contested at trial, nor could it be. Ellis owned a salvage yard on Baltimore Harbor. Baltimore Harbor is one of the busiest commercial harbors in the United States. See, e.g., Timothy Burn, Baltimore Shipyard Reborn after Layoffs, Washington Times, Feb. 17, 1998 at B8. The Coral Sea, an aircraft carrier, sailed into a slip at the Seawitch site from Philadelphia. This case is not like Wilson, in which the real possibility existed that the landowner was unaware that his property was a wetland or was connected to the waters of the United States. Baltimore Harbor

23

is perhaps the quintessential example of a water of the United States, and it is incontrovertible that Ellis made his living profiting from those waters. Reversing Ellis's conviction for a redetermination of whether he knew his property was along a harbor or that Baltimore Harbor was a water of the United States in the face of such overwhelming evidence would be a nonsensical exercise at great public expense. See Johnson, 117 S. Ct. at 1550 (noting that appellate reversals in the face of overwhelming evidence of guilt jeopardize the reputation and integrity of the judicial system).

Additionally, based on the testimony adduced at trial, it is uncontestable that Ellis knew that his employees were dumping debris and oil into the harbor. It is also clear that Ellis knew his permit status. During trial several workers testified that Ellis told them to wash all demolition debris down the deck drains of the ships into the river, including petroleum products that would create a sheen when they hit the water. One worker, Mr. Mora, testified that when he asked Ellis about whether it was alright to wash the debris into the river Ellis replied "that there was no problem." (J.A. at 148.) Two workers, Mr. Murphy and Mr. Young, testified that it was the standard operating practice to treat any petroleum sheen created in the water near the demolition site with dishwashing liquid to eliminate the sheen. The truth of this testimony was not contested by Ellis at trial. Additionally, Douglas Hensel, an environmental consultant, testified that he witnessed the workers hosing off the decks and witnessed a sheen being created on the water as a result of that process. He also saw a sheen floating out into the bay from the Seawitch site. Hensel also stated that he told Ellis that dumping that created a sheen on the water was a violation of federal regulations. Neither the truth of Hensel's testimony nor his credibility were challenged on cross examination. Rather, Ellis's attorney questioned only whether the sheen he saw floating out to sea might have originated from one of several municipal storm drains near the Seawitch property. At no time during the trial did Ellis enter an exhibit that purported to be a permit to dump debris of any kind into the water. Based upon all of this uncontested evidence, any reasonable jury would have reached the conclusion that Ellis had the requisite knowledge of the incidents occurring on his salvage yard.

Therefore, in the final analysis, Ellis's claim that erroneous jury instructions on counts five and six of the indictment require reversal

24

of his convictions must fail. Although the instructions were in technical violation of the new rule we announced in Wilson, overpowering evidence supports the conclusion that Ellis possessed the requisite knowledge. As a result, no harm to the fairness, integrity, or public reputation of the judicial proceedings has occurred, and we decline to notice the error.

E.

Finally, Ellis challenges the sufficiency of the evidence supporting his conviction for count four, making a false statement to DRMS regarding asbestos abatement that occurred on the Coral Sea prior to its demolition.

In determining whether the evidence presented at trial was sufficient to support a conviction, the jury's verdict must be upheld on appeal if there was substantial evidence to support the verdict. See Glasser v. United States, 315 U.S. 60, 80 (1942). In determining whether the evidence presented was substantial, we view the evidence in the light most favorable to the Government and inquire whether a "reasonable finder of fact could accept [the evidence] as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

To prove a violation of 18 U.S.C.A. § 1001, the government must show beyond a reasonable doubt that the defendant wilfully made a material, false representation in a matter within the jurisdiction of a department or agency of the United States. See 18 U.S.C.A. § 1001 (West Supp. 1998). At trial, the Government adduced evidence that tended to show that in response to DRMS's request for information on the progress of asbestos abatement for the Coral Sea, Ellis reported that four frames of the ship had been abated by AES. The Government produced an AES invoice that reflected that asbestos abatement had occurred on only two frames of the ship. Additionally the Government called the president of AES as a witness. He, too, verified that abatement had occurred only in two frames of the ship. He further testified that Ellis personally indicated which asbestos to remove from the ship.

25

Ellis asserts that the Government's evidence was solely hearsay from an unbelievable witness. Ellis's letter and the AES invoice were not hearsay. Further, credibility of the witnesses is strictly a matter for the jury. See United States v. Johnson, 55 F.3d 976, 979 (4th Cir. 1995). Ellis's contention that the guilty verdict on count four was not supported by the evidence is without merit; the Government's evidence was substantial.

III.

For the reasons stated herein, we affirm Ellis's convictions in all respects.

AFFIRMED

26